**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SS&C TECHNOLOGIES, INC.; SS&C TECHNOLOGIES HOLDINGS, INC.; and DST HEALTH SOLUTIONS, LLC,

Plaintiffs,

v.

MCS HEALTHCARE HOLDINGS, LLC and MEDICAL CARD SYSTEM, INC.,

Defendants.

**COMPLAINT FOR:**

1. **Breach of Contract**
2. **Trade Secret Misappropriation (18 U.S.C. § 1836)**
3. **Trade Secret Misappropriation (New York Common Law)**
4. **Declaratory Judgment**

**JURY TRIAL DEMANDED**

Christman Rice
Marissa R. Benavides
Seth Massey
Samuel Libby
**BRAUNHAGEY & BORDEN LLP**
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
Facsimile: (646) 403-4089
rice@braunhagey.com

*Counsel for Plaintiffs SS&C Technologies, Inc., et al.*

Plaintiffs SS&C Technologies, Inc.; SS&C Technologies Holdings, Inc.; and DST Health Solutions, LLC ("SS&C") bring this action for breach of contract, misappropriation of trade secrets, and declaratory relief against Defendants MCS Healthcare Holdings, LLC and Medical Card System, Inc. ("MCS" or "Defendants") and allege as follows:

## INTRODUCTION

1. SS&C provides tech-enabled solutions in the healthcare space, including an array of sophisticated software platforms that assist clients and customers in processing medical and pharmacy claims and benefits. SS&C has invested hundreds of millions of dollars developing and maintaining its proprietary software platforms, and this case seeks to enforce SS&C's contractual, statutory, and common law rights to prevent a competitor from gaining access to SS&C's valuable source code, trade secrets, and other confidential information.

2. On June 30, 2025, SS&C and MCS executed a Perpetual Source Code Licensing Agreement (the "Agreement"), pursuant to which MCS received the right to possess the source code for SS&C's PowerMHS software product, an industry-leading platform that enables health plans to efficiently administer medical claims. As part of the Agreement, MCS agreed to be bound by a set of restraints designed to protect SS&C's intellectual property rights relating to the PowerMHS software. These restraints include robust confidentiality provisions, clauses ensuring that SS&C retains ownership over all derivatives of the software, prohibitions on disclosure to third parties, obligations for MCS to share relevant information regarding its use of the software in real time, and an audit right. Perhaps most importantly, the parties agreed to an anti-assignment provision requiring SS&C's prior written consent before any transaction that would effect a change of control of MCS, limited only by a requirement that SS&C's consent "shall not be unreasonably withheld." These provisions are intended to ensure that SS&C does not lose control over its valuable software, trade secrets, and other know-how and expertise—and the Agreement makes clear that even "threatened violation" of the confidentiality provisions constitutes a breach warranting immediate injunctive relief.

3. On August 5, 2026, MCS informed SS&C that it was being acquired by MedImpact, an entity that competes with SS&C in the market for tech-enabled medical and pharmacy claims processing services.[1] MCS sought SS&C's consent for the acquisition and, in response, SS&C raised concerns that the transaction would give its competitor possession of SS&C's source code, trade secrets, and other confidential information. The parties engaged in a commercial dialogue, culminating in a discussion on September 2, 2026, at which SS&C proposed an arrangement whereby it would consent to the transaction if MCS would agree both to abide by increased confidentiality protections and pay an additional licensing fee.

4. MCS refused. Instead, it has retained litigation counsel and sent a series of threatening letters in an effort to compel SS&C's consent. In those letters, MCS has (a) asserted that it is *per se* unreasonable for SS&C to decline to consent to a transaction that would give a direct competitor access to its source code and (b) threatened to sue SS&C for its supposed "ongoing and willful breach of its obligation to not unreasonably withhold consent." Those threats and accusations ignore both the plain text of the Agreement's anti-assignment provision and SS&C's legitimate concerns about the extent to which MCS plans to disclose (or has already disclosed) SS&C's confidential information to MedImpact as part of pre-deal diligence. In response, MCS has offered only blithe reassurances that it "takes its obligations . . . seriously" and has provided no information about the timing of the transaction or the state of the diligence process beyond stating that "no definitive agreement for the Proposed Sale has been signed."

5. These evasive assurances ring hollow. MCS has either already disclosed significant amounts of SS&C's confidential information or is on the verge of making such disclosures as it barrels towards a sale to SS&C's direct competitor. SS&C brings this action and seeks contemporaneous preliminary injunctive relief in order to preserve the status quo and vindicate its contractual, statutory, and common law rights.

---

[1] The potential transaction was publicly disclosed that same day. *See* Ellen DiMauro & Paula Seligson, *Ares Eyes $2 Billion Loan Deal in Private Credit's Slow Year*, Bloomberg (Aug. 5, 2026, 3:14 PM EDT), https://www.bloomberg.com/news/articles/2026-08-05/ares-eyes-2-billion-loan-deal-in-slow-year-for-private-credit.

## PARTIES

**A. The SS&C Parties**

6. Plaintiff SS&C Technologies, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 80 Lamberton Road, Windsor, Connecticut 06095.

7. Plaintiff SS&C Technologies Holdings, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 80 Lamberton Road, Windsor, Connecticut 06095.

8. Plaintiff DST Health Solutions, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 1055 Broadway Blvd., Kansas City, Missouri 64105.

**B. The MCS Parties**

9. Defendant MCS Healthcare Holdings, LLC is a limited liability company organized and existing under the laws of Puerto Rico with its principal place of business at MCS Plaza, Ponce de León Avenue 255, San Juan, Puerto Rico 00917.

10. Defendant Medical Card System, Inc. is a corporation organized and existing under the laws of Puerto Rico with its principal place of business at MCS Plaza, Ponce de León Avenue 255, San Juan, Puerto Rico 00917.

## JURISDICTION AND VENUE

11. This Court has federal question jurisdiction over Plaintiffs' claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

13. Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

14. Moreover, the Agreement contains a forum selection clause designating this Court as the exclusive federal forum for SS&C's claims. (*See* Agreement § 6.7.9.)

## FACTUAL BACKGROUND

### A. The PowerMHS Software Product

15. SS&C has devoted hundreds of millions of dollars to developing and refining the PowerMHS software platform, which is a tool that permits users to automate healthcare claims processing in the medical industry.

16. SS&C owns all rights to the PowerMHS platform and its associated tools and functionalities, and it goes to great lengths to protect the confidentiality and secrecy of those tools and functionalities. As a result, the PowerMHS platform is independently valuable because its details, design, architecture, and other proprietary features are not generally known or readily ascertainable.

#### 1. The PowerMHS Tool Has Independent Economic Value

17. PowerMHS is a valuable product because its database architecture simplifies claims administration, creating efficiencies for SS&C's clients. Put simply, the PowerMHS software lets its health plan users efficiently process medical claims and conduct platform accounting.

18. PowerMHS and its related software and tools provide the following functionalities, among others:

> **Claims Processing:** PowerMHS's unique architecture—developed based on decades of SS&C industry expertise—permits users to handle the full claims cycle for health plans, from receiving and adjudicating claims to making adjustments.
>
> **Rules-Based Adjudication:** PowerMHS's flexible internal logic permits it to adjudicate claims automatically using configurable, table-driven business rules instead of hard-coded logic.
>
> **Batch and Real-Time Processing:** PowerMHS is capable of processing claims either in scheduled high-volume batches or one at a time in real time.
>
> **Exception Routing**: PowerMHS is designed to send claims that fail automatic adjudication to the right operations teams for manual review.

**Front-End Data Capture:** PowerMHS's proprietary user interface allows for manual claim data entry as well as batch claim loads for UB-04, CMS1500, and Dental claim types.

**Claim Adjustments:** PowerMHS's flexible structure allows personnel to reprocess and correct claims that were already adjudicated.

**Benefits Configuration:** PowerMHS is able to define benefit plans and plan variations, including state-specific coverage rules.

**Member Cost-Sharing:** PowerMHS is configured to apply copays, coinsurance, deductibles, and out-of-pocket maximums when pricing claims.

**Member Enrollment and Eligibility:** PowerMHS's internal architecture and user interface enable management of member enrollment and membership records, and the tool automatically checks eligibility against enrollment feeds.

**Claims Editing Rules:** The system is built to run configurable edits on claims and interfaces with a variety of third-party editing and payment-integrity tools.

**Pre-Authorization and Medical Policy:** PowerMHS enforces pre-authorization guidelines and medical policy rules during adjudication so claims are paid correctly.

**Provider Management and Billing:** PowerMHS supports provider management and billing alongside member services.

**Downstream Integration:** PowerMHS's flexible internal architecture enables the platform to connect to enrollment systems, eligibility checks, and downstream financial posting systems, enabling end-to-end member and claims record flows.

**HIPAA Compliance:** The platform supports and ensures HIPAA compliance for electronic healthcare transactions required by CMS.

19. The software, architecture, databases, processes, methods, techniques, codes, and design underpinning these features of the PowerMHS tool are tightly guarded trade secrets.

**2. SS&C Protects the PowerMHS Product with Industry-Leading Confidentiality and Security Measures**

20. Much of the value of the PowerMHS product flows from the confidentiality of its internal architecture and logic, proprietary user interface design, and other unique features.

21. SS&C takes reasonable measures to protect the confidentiality of the PowerMHS software and all related confidential information.

22. Among other things, SS&C ensures that the PowerMHS source code is stored locally on an iSeries environment at SS&C's Winchester datacenter, which is not connected to the internet. SS&C limits access to users whose user IDs and passwords are provided by

SS&C's security team via iSeries security to SS&C employees. SS&C does not permit clients to have credentials to access its system. All source code and executables are encrypted at rest. SS&C's Winchester datacenter also employes additional physical and electronic security measures.

23. SS&C further limits access to the confidential aspects of the PowerMHS product—including various design documents, schematics, and other confidential materials—to a limited number of employees on a need-to-know basis. SS&C requires such employees to access the information only using secure, password-protected, company-issued devices, and each of those employees agrees to be bound by robust confidentiality and non-disclosure obligations as a condition of their employment.

24. SS&C also ensures that any clients or customers given access to confidential aspects of the PowerMHS platform or related information agree to be bound by confidentiality obligations prior to receiving access. These provisions—many of which appear in the Agreement at issue here—include, among other things, obligations that strictly limit both access to the product and the acceptable scope of use. SS&C's licensing contracts also include robust information and audit rights, ensuring that SS&C is able to monitor the software and ensure that confidentiality is maintained.

**B. MCS's Relationship with SS&C**

25. MCS was founded in 1983 and now provides a variety of group and individual health and life insurance products to clients in Puerto Rico. MCS maintains an extensive provider network comprising more than 15,000 physicians, more than 40,000 commercial pharmacies, and more than 50,000 Medicare pharmacies in Puerto Rico and the United States, as well as dentists, laboratories, and hospitals. As of August 2026, MCS serves more than 650,000 members and insureds across its product lines and employs more than 2,500 people.

26. MCS is a longtime client of SS&C and its subsidiaries. As relevant here, MCS and SS&C's predecessors in interest entered into an agreement to license software and services (the "Prior Agreement") on or about December 1, 1989. The Prior Agreement provided MCS

with a license to utilize SS&C's software, with SS&C retaining all intellectual property rights to the software and any enhancements to it. The Prior Agreement required SS&C's consent for any assignment and provided SS&C with audit rights.

**C. MCS Requests a Perpetual License and Access to SS&C's Source Code**

27. On or about October 16, 2024, during a quarterly business review meeting, SS&C informed MCS that it was ending routine support for PowerMHS at the end of 2026, when it planned to transition its clients to its newer AMISYS Advance software. AMISYS Advance is a next-generation, AI-enabled platform developed by the same subject-matter experts who worked on PowerMHS and incorporates much of the same business logic. During that meeting, as an alternative to transitioning to AMISYS Advance, SS&C shared the pricing for a business model whereby SS&C would license MCS the right to possess the PowerMHS source code for approximately [redacted], in order for MCS to remain on the PowerMHS software to service its existing business.

28. In or around April 2025, MCS informed SS&C that it intended to license the PowerMHS source code rather than transition to AMISYS Advance. In response, SS&C circulated a proposed license agreement.

**D. MCS and SS&C Negotiate the Agreement and an Anti-Assignment Provision**

29. On or about May 19, 2025, MCS responded to SS&C's proposed license agreement and requested several revisions. Because MCS would be given access to SS&C's source code, much of the negotiations focused on anti-assignment protections.

30. On or about June 25, 2025, MCS proposed changes to the anti-assignment section that would have lessened SS&C's protections, including by: [redacted]

31. SS&C [redacted] As SS&C's Managing Counsel James Fite explained to MCS, the draft

agreement [redacted] and, as a result, [redacted]

32. MCS nevertheless requested additional changes to the anti-assignment provision, including by asking SS&C to include language that would [redacted] On or about June 27, 2025, SS&C rejected this edit but [redacted] MCS accepted SS&C's language.

33. On or about June 30, 2025, the parties executed the Agreement (attached hereto as Exhibit A).

**E. The Agreement Protects SS&C's Intellectual Property**

34. Under the Agreement, MCS agreed to pay SS&C a "Source Code Licensing Fee" of [redacted] in exchange for, *inter alia*, a [redacted] the source code of [redacted] the "Software") at designated installation locations. (Agreement § 2.2(a)-(c).) The Agreement permits MCS to use the Software's Source Code for MCS's [redacted] (*Id.* § 2.2(c).)

35. The Agreement also provides robust protections for SS&C's intellectual property rights. The Agreement includes several features that protect SS&C's trade secrets and other confidential information.

36. ***Ownership***. The Agreement provides that [redacted] (Agreement § 2.3 (emphasis added).) The Agreement

states that MCS [redacted] (*Id.*) The Agreement also prohibits MCS from [redacted] (*Id.*)

37. ***Confidentiality***. The Agreement restricts MCS's [redacted], and even then only upon execution of a corresponding confidentiality agreement.

a. The Agreement defines "Confidential Information" broadly to include [redacted] (*Id.* § 1.4.)

b. The Agreement defines [redacted] in turn, to including "written instructions regarding the use and functions of the Software or [redacted] (*Id.* § 1.5.)

c. The Agreement provides that th [redacted] (*Id.* § 6.3.1.)

d. If required to legally disclose any confidential information, MCS agreed to [redacted]

[redacted] (*Id.*)

38. ***Third parties***. The Agreement prohibits MCS from using [redacted] (*Id.* § 2.3(c).) MCS also may not [redacted] (*id.*), or [redacted] (*Id.* § 2.3(d).)

39. ***Audit and information rights***. The Agreement provides SS&C Health with audit and information rights, requiring MCS to [redacted] (*Id.* § 6.1.3.) In addition, MCS is required to [redacted] (*id.* § 2.2(c)), and it must also [redacted] (*Id.* § 2.4.)

40. ***Anti-assignment***. The Agreement contains a broad anti-assignment provision that states, in full:

[redacted]

[redacted]

[redacted] (*Id.* § 6.5 (emphasis added).)

41. ***Injunctive relief***. The parties also agreed that any [redacted] f the Agreement's confidentiality provisions [redacted] (*Id.* § 6.7.15.)

**F. MCS Seeks SS&C's Consent to an Assignment to MedImpact, SS&C's Competitor**

42. On or about August 5, 2026, MCS informed SS&C for the first time that it was in talks to be acquired by MedImpact and sought SS&C's consent to the transaction (the "Proposed Sale").

43. SS&C and MedImpact are direct competitors across multiple segments of the healthcare technology and benefits administration industry, including tech-enabled pharmacy benefit administration, medical claims processing, health-plan administration, government health programs, and data analytics. Both companies invest hundreds of millions of dollars in their

respective software platforms. And a study published in the Journal of the American Medical Association ranked each of them a "top 5 PBM," or pharmacy benefit manager.[2]

44. Both companies also serve government health programs. MedImpact administers Medicare Part D, Medicare Advantage Prescription Drug, Medicaid, Medicare-Medicaid, Marketplace, and encounter-processing programs. SS&C has more than thirty years of experience supporting government programs, including medical and pharmacy administration.

45. SS&C and MedImpact also compete in healthcare data and analytics. MedImpact offers clinical data services, prescription performance data, risk management, care coordination, and population health analytics. SS&C offers the Johns Hopkins ACG system®, CareAnalyzer, revenue and quality analytics, and total-cost-of-care management tools.

**1. SS&C's Competitive Business Lines**

46. SS&C provides third-party administration services for medical claims processing enabled by its best-in-class software products and technology stack—that is, the services enabled by PowerMHS and the other software at issue in the Agreement. SS&C is licensed as a third-party administrator of medical claims in numerous states. But SS&C also provides an array of pharmacy benefit and claim management services, and its subsidiaries are licensed pharmacy benefit managers or administrators in states across the country.[3] Further, SS&C has launched a cutting-edge pharmacy claims adjudication platform called DomaniRx, which enables users to "modernize [their] pharmacy benefits administration."[4]

47. SS&C's filings with the Securities and Exchange Commission note that it competes broadly for customers in both the pharmacy and medical claims arenas, explaining that in "healthcare markets, we compete with providers of pharmacy and medical claims processing,

---

[2] Dima M. Qato, Yugen Chen, and Karen Van Nuys, *Pharmacy Benefit Manager Market Concentration for Prescriptions Filled at US Retail Pharmacies*, JAMA (Sept. 10, 2024), https://jamanetwork.com/journals/jama/fullarticle/2823618.

[3] *See, e.*g., SS&C Technologies Holdings, Inc. Annual Report (Form 10-K) (Feb. 26, 2026) (hereinafter "SS&C 2025 10-K"), Ex. 21 (listing subsidiary DST Pharmacy Solutions, Inc., a licensed PBM in multiple states).

[4] DomaniRx Webpage, https://www.ssctech.com/solutions/domanirx (last accessed Sept. 15, 2026).

benefit management, care management, business process outsourcing, and business intelligence and analytics solutions."[5] SS&C's public filings further disclose that the company's competitors "include organizations offering comprehensive healthcare administration platforms and health outcomes optimization services."[6]

### 2. MedImpact's Competitive Business Lines

48. MedImpact is just such an organization. It advertises its ability to process medical claims as a third-party administrator through Verdegard, thereby competing directly with SS&C and its PowerMHS platform in the medical claims arena.[7]

49. MedImpact also holds itself out as the "largest independent health solutions, technology, and pharmacy benefit management provider" and touts itself as "continually invest[ing] in innovation and reinvention to offer an ecosystem of total health and technology solutions to meet the needs of clients in a complex and challenging healthcare landscape"[8] by selling "technology and marketplace solutions."[9]

50. In other words, MedImpact and SS&C both provide an array of tech-enabled pharmacy and medical claims management and processing services.

### 3. SS&C and MedImpact Compete for the Same RFPs from the Same Customers

51. Because SS&C and MedImpact provide similar services, they regularly compete for the same customers and submit bids in response to the same requests for proposal ("RFPs"). Many potential customers are private payers or health plans with private RFP processes—but during the bidding processes, customers often inform SS&C that MedImpact has also submitted

[5] SS&C 2025 10-K at 18.

[6] *Id.*

[7] *MedImpact Announces Acquisitions of Employer Insurance and Risk Management Companies*, MedImpact (Mar. 12, 2026), https://www.medimpact.com/clients/resources/press-releases/medimpact-expands-portfolio-health-solutions-acquisition-two.

[8] *MedImpact Acquires Elixir Solutions*, MedImpact (Feb. 1, 2024), https://www.medimpact.com/clients/resources/press-releases/medimpact-acquires-elixir-solutions.

[9] *MedImpact Investment in Bayvrio Accelerates Development and Launch of Groundbreaking Healthcare Solutions Marketplace*, MedImpact (Mar. 11, 2025), https://www.medimpact.com/clients/resources/press-releases/medimpact-investment-bayvrio-accelerates-development-and-launch.

a bid. And where RFP participation is publicly disclosed, SS&C and MedImpact are shown to compete.

52. For instance, when North Carolina announced an RFP seeking PBM services for the State Health Plan for Teachers and State Employees in early 2026, it published a list of entities that expressed interest in bidding. Unsurprisingly, that initial list included both SS&C and MedImpact.

53. And in January 2022, the Inland Empire Health Plan—a managed healthcare plan in California—publicly disclosed that it was ending its nearly two-decade PBM relationship with SS&C, engaging MedImpact instead.[10]

**4. SS&C and MedImpact Have Competed for MCS's Business**

54. This competitive posture should come as no surprise to MCS, since SS&C and MedImpact recently went head-to-head for MCS's PBM business. Between October 2024 and June 2025, SS&C pitched its DomaniRx platform to MCS, culminating in a demonstration to Dr. Carolyn Rodriguez, MCS's Chief Pharmacy Officer, on June 9, 2025.

55. The materials presented to MCS at that demonstration described DomaniRx as a "one-stop shop PBM" with "end-to-end capabilities." SS&C and MCS had planned a follow-up discussion on July 24, 2025, but MCS canceled that meeting and engaged MedImpact as its PBM service provider instead.

56. In other words, MCS has known that SS&C competes with MedImpact since at least October 2024. MCS was even engaged in competitive discussions with both companies when it agreed that SS&C's consent would be required prior to any change-of-control transaction.

---

[10] *See* REMINDER: Pharmacy Benefits Manager PBM Change (Dec. 29, 2022), https://www.providerservices.iehp.org/content/dam/provider-services/en/documents/providers/plan-updates/provider_notices/2022/12---december/20221229---reminder--pharmacy-benefits-manager-pbm-change-for-dualchoice-hmo-dsnp--member-outreach.pdf.

### G. MCS Rejects SS&C's Proposal to Grant its Consent Based on Certain Assurances and Conditions

57. After MCS sought SS&C's consent for the MedImpact acquisition, the parties engaged in a series of discussions regarding the request.

58. Those discussions culminated in a teleconference via Microsoft Teams on September 2, 2026, involving representatives of both parties, including MCS's Chief Executive Officer, James O'Drobinak, and SS&C Health's General Manager, Tori Dargati. During this conversation, Ms. Dargati raised SS&C's serious competitive concerns about the Proposed Sale.

59. Notwithstanding those concerns, Ms. Dargati proposed an arrangement whereby SS&C would be willing to consent, which would involve both additional confidentiality protections and guardrails intended to ensure that SS&C would suffer no competitive disadvantage and an additional licensing fee.

60. Mr. O'Drobinak acknowledged Ms. Dargati's proposal and ended the conversation. To date, MCS has provided neither a counteroffer nor information or assurances adequate to address SS&C's concerns.

61. Instead, MCS has proceeded with its efforts to pursue the Proposed Sale.

### H. In Increasingly Aggressive Correspondence, MCS Fails to Provide Adequate Information Regarding the Status of Diligence or Its Disclosures

62. In a letter dated September 8, 2026, SS&C's General Counsel informed MCS that it was in material breach of the Agreement insofar as it had disclosed or intended to disclose any "Confidential Information" (as defined in the Agreement) to any third party as part of pre-deal diligence. SS&C explained that the Proposed Sale constituted an assignment to a competitor without SS&C's consent as required by the Agreement and that any sharing of confidential information with third parties in connection with the Proposed Sale would constitute a material breach. SS&C also informed MCS that it would be exercising its audit rights. SS&C closed its letter by stating that it "remains hopeful that we can resolve this matter without resorting to litigation and welcomes another opportunity to discuss a mutually acceptable path forward," which SS&C suggested would be "most effective without lawyers being involved."

63. Rather than taking SS&C up on its offers to continue a commercial dialogue, MCS responded in a letter dated September 12, 2026 from its outside litigation counsel at Kirkland & Ellis. In that letter, MCS demanded that SS&C execute and return MCS's original consent letter, threatening to sue SS&C and seek "significant damages that would result if SS&C's unreasonable withholding of consent, or any related litigation, causes MedImpact to abandon interest in the Proposed Sale." MCS took the position that SS&C's declination to provide consent was *per se* unreasonable in light of the Agreement's other protections, and also stated that "MCS takes its [confidentiality] obligations under §§ 2.2, 2.3, and 6.3.1 of the Agreement seriously." MCS set a deadline of less than a week later for SS&C to execute the proposed consent letter, which lacked any assurances regarding the treatment of SS&C's proprietary and confidential information.

64. On or about September 16, 2026, the undersigned counsel for SS&C responded to MCS's letter, explaining that SS&C and MedImpact are direct competitors across medical and pharmacy claims processing and administration and that SS&C's refusal to consent to the Proposed Sale was reasonable as a matter of law. SS&C also sought additional information that MCS had previously been required to provide under Sections 2.2(c), 2.3, 2.4, and 6.1.4 of the Agreement but which MCS had not provided, including the locations and devices on which MCS had installed or stored the Software and copies of all enhancements, modifications, and derivatives of the source code.

65. In a letter dated September 22, 2026, counsel for MCS replied to SS&C's September 16 letter, providing some, but not all, of the requested information and stating that "MCS has abided by all of its obligations under the Agreement." MCS's letter also stated that "no definitive agreement for the Proposed Sale has been signed" but provided no other information about the deal status. MCS further stated that "under no circumstances would SS&C Health be entitled to enjoin the signing of a definitive agreement for, or consummation of, the Proposed Sale."

### I. MCS Has Disclosed or Threatened to Disclose SS&C's Confidential Information to MedImpact

66. MCS's conduct and lack of transparency indicate that it has disclosed (or soon will disclose) to MedImpact and other third parties SS&C's "Confidential Information" under the meaning of the Agreement. Such information includes not only the source code itself, but also any and all [redacted] relating to the PowerMHS and related software, any [redacted] (*See* Agreement §§ 1.4, 1.5.) Indeed, even permitting an unauthorized third party to interact with PowerMHS's proprietary user interface would constitute a breach and threaten to inflict irreparable harm on SS&C by disclosing its trade secrets, know-how, and other confidential information.

67. Disclosure of such information is a standard part of any due diligence process, which would ordinarily include (a) disclosure of all material contracts, (b) disclosure of information regarding the use and function of key software products, and (c) in-person site visits involving demonstrations of key workflows.

68. MCS has failed to provide any information regarding the status of the Proposed Sale beyond stating that no "definitive agreement" has yet been signed. Because the signing of a definitive agreement occurs quite late in a deal process—and because MCS has failed to identify any other deal milestone that has not yet occurred—it appears that diligence either is underway or has been completed.

69. These facts, combined with MCS's insistence that it is continuing to pursue the Proposed Sale, indicate either that a [redacted] of the Agreement's confidentiality provisions has already occurred. (*See* Agreement § 6.7.15.)

70. That inference is supported by the fact that, nearly seven weeks ago, public reporting disclosed that MedImpact had sought a $2.2 billion private credit loan to support the acquisition—a determination that MCS, MedImpact, and their advisors likely could have reached only as a result of a comprehensive diligence process. (*See supra* note 1.)

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Breach of Contract**
***(Against MCS Healthcare Holdings, LLC)***

71. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

72. The Agreement constitutes a valid, enforceable contract under New York law.

73. Plaintiff DST Health Solutions, LLC has satisfactorily performed all of its obligations under the Agreement.

74. Defendant MCS Healthcare Holdings, LLC has breached the Agreement by violating and/or engaging in conduct that threatens to violate, *inter alia*, Sections 2.2(c), 2.3, 2.4, 6.3.1, and 6.5 of the Agreement.

75. Plaintiff DST Health Solutions, LLC has suffered and will continue to suffer irreparable harm as a result of Defendant MCS Healthcare Holdings, LLC's breaches.

### SECOND CLAIM FOR RELIEF
**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836**
***(Against All Defendants)***

76. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

77. Aspects of Plaintiffs' Software and related databases, processes, products, know-how, expertise, designs, methods, techniques, procedures, programs, and codes constitute protectable trade secrets.

78. These trade secret processes and information are not readily ascertainable through proper means.

79. Plaintiffs have derived actual economic value from these trade secrets and their secrecy, which has put Plaintiffs ahead of their competitors.

80. Plaintiffs took reasonable steps to protect their trade secrets by instituting confidentiality policies, providing designated, company-owned computers to their employees with which all of their work was to be done, requiring employees agree to non-competition

agreements and confidentiality and proprietary information agreements, sharing trade secrets with only a limited, restricted group of employees on a need-to-know basis, limiting or prohibiting provision of those trade secrets to third parties and/or only those with confidentiality obligations in place, and labeling certain documents and information as proprietary and confidential.

81. These trade secrets are important to Plaintiffs' business and strategy, and if the trade secrets or the way in which they were developed, tested, or implemented become generally known to competitors, Plaintiffs will suffer irreparable harm.

82. Defendants have misappropriated and/or disclosed Plaintiffs' trade secrets, including by disclosing those trade secrets to MedImpact and other third parties in violation of Defendants' contractual obligations to Plaintiffs or by other improper means.

**THIRD CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets Under New York Common Law**
***(Against All Defendants)***

83. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

84. Aspects of Plaintiffs' Software and related databases, processes, products, know-how, expertise, designs, methods, techniques, procedures, programs, and codes constitute protectable trade secrets under New York common law.

85. These trade secret processes and information are not readily ascertainable through proper means.

86. Plaintiffs have derived actual economic value from these trade secrets and their secrecy, which has put Plaintiffs ahead of their competitors.

87. Plaintiffs took reasonable steps to protect their trade secrets by instituting confidentiality policies, providing designated, company-owned computers to its employees with which all of their work was to be done, requiring employees agree to non-competition agreements and confidentiality and proprietary information agreements, sharing trade secrets

with only a limited, restricted group of employees on a need-to-know basis, limiting or prohibiting provision of those trade secrets to third parties and/or only those with confidentiality obligations in place, and labeling certain documents and information as proprietary and confidential.

88. These trade secrets are important to Plaintiffs' business and strategy, and if the trade secrets or the way in which they were developed, tested, or implemented become generally known to competitors, Plaintiffs will suffer irreparable harm.

89. Defendants have misappropriated and/or disclosed Plaintiffs' trade secrets, including by disclosing those trade secrets to MedImpact and other third parties in violation of Defendants' contractual obligations to Plaintiffs or by other improper means.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Judgment—Scope of Confidentiality Provisions**
***(Against MCS Healthcare Holdings, LLC)***

90. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

91. An actual and justiciable controversy exists between Plaintiffs and MCS concerning the scope of the confidentiality provisions of the Agreement.

92. The Agreement defines "Confidential Information" broadly to encompass not only the PowerMHS source code but [redacted]

93. In connection with the Proposed Sale, the Agreement does not permit MCS to disclose any Confidential Information—including the Software's source code and any derivatives thereof—to any acquirer of MCS, any potential acquirer conducting due diligence, any investment banker or financial advisor, any management consulting firm, any parent or holding company, or any other third party.

94. Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that: (i) SS&C's source code and all enhancements, modifications, and derivatives thereof constitute Confidential Information under the Agreement; (ii) the terms of the Agreement itself constitute Confidential Information under the Agreement; (iii) information regarding the use, functions, design, and interface of the Software constitutes Confidential Information under the Agreement; (iv) MCS may not disclose such Confidential Information to any acquirer or potential acquirer of MCS, or to any agent, advisor, affiliate, or representative thereof; and (v) any such disclosure constitutes a material breach of the Agreement.

**FIFTH CLAIM FOR RELIEF**
**Declaratory Judgment—Assignment Requiring Consent**
***(Against MCS Healthcare Holdings, LLC)***

95. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

96. An actual and justiciable controversy exists between Plaintiffs and MCS concerning whether the Proposed Sale would function as an assignment or transfer of the Agreement requiring SS&C's prior written consent under the Agreement.

97. An acquisition of MCS constitutes a change of control as defined under the Agreement, which requires SS&C's prior written consent.

98. SS&C has not consented to an assignment in writing.

99. The Proposed Sale would result in a change of control and an assignment of the Agreement.

100. Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that: (i) the Proposed Sale would constitute an assignment under the Agreement; (ii) such assignment requires SS&C's prior written consent; (iii) SS&C has not consented; and (iv) any attempted consummation of the Proposed Sale without SS&C's prior written consent would constitute a material breach of the Agreement.

**SIXTH CLAIM FOR RELIEF**
**Declaratory Judgment—Reasonableness of Withholding Consent**
***(Against MCS Healthcare Holdings, LLC)***

101. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

102. An actual and justiciable controversy exists between Plaintiffs and MCS concerning whether Plaintiffs acted reasonably by declining to consent to the Proposed Sale on the basis of concerns that the Proposed Sale would give MedImpact, a competitor, possession of Plaintiffs' source code and other trade secrets and confidential information.

103. Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that it is not unreasonable as a matter of law for Plaintiffs to decline to consent to the Proposed Sale on the basis that the Proposed Sale, if consummated, would give a competitor possession of Plaintiffs' source code and other trade secrets and confidential information.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that the Court issue the following relief:

A. Preliminary and permanent injunctive relief enjoining Defendants from further use, disclosure, or dissemination of SS&C's Software and Confidential Information, and from consummating the Proposed Sale absent SS&C's consent;

B. An order finding that Defendants are in material breach of the Agreement;

C. A declaration that (i) SS&C's source code and all enhancements, modifications, and derivatives thereof constitute Confidential Information under the Agreement; (ii) the terms of the Agreement itself constitute Confidential Information under the Agreement; (iii) information regarding the use, functions, design, and interface of the Software constitutes Confidential Information under the Agreement; (iv) MCS may not disclose such Confidential Information to any acquirer or potential acquirer of MCS, or to any agent, advisor, affiliate, or

representative thereof; and (v) any such disclosure constitutes a material breach of the Agreement;

D. A declaration that (i) the Proposed Sale would constitute an assignment under the Agreement; (ii) such assignment requires SS&C's prior written consent; (iii) SS&C has not consented; and (iv) any attempted consummation of the Proposed Sale without SS&C's prior written consent would constitute a material breach of the Agreement;

E. A declaration that it is not unreasonable as a matter of law for Plaintiffs to decline to consent to the Proposed Sale on the basis that the Proposed Sale, if consummated, would give a competitor possession of Plaintiffs' source code and other trade secrets and confidential information;

F. Damages in an amount to be proven at trial;

G. Punitive damages for Defendants' willful violations;

H. Pre- and post-judgment interest at the lawful rate;

I. All allowable attorneys' fees and costs; and

J. All such other and further relief as the Court may deem just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 25, 2026

**BRAUNHAGEY & BORDEN LLP**

By: ____________________

Christman Rice
Marissa R. Benavides
Seth Massey
Samuel Libby

**BRAUNHAGEY & BORDEN LLP**
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
Facsimile: (646) 403-4089
rice@braunhagey.com

*Counsel for Plaintiffs SS&C Technologies, Inc., et al.*

# EXHIBIT A - FILED UNDER SEAL