**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SS&C TECHNOLOGIES, INC.; SS&C TECHNOLOGIES HOLDINGS, INC.; and DST HEALTH SOLUTIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MCS HEALTHCARE HOLDINGS, LLC and MEDICAL CARD SYSTEM, INC.,<br><br>Defendants. | Case No. ________________ |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

A. The PowerMHS Platform ........ 2

B. The 2025 Agreement ........ 3

C. MCS Seeks Consent to Its Acquisition by MedImpact ........ 5

D. The Proposed Sale Threatens to Expose SS&C's Confidential Information ........ 7

ARGUMENT ........ 8

I. SS&C WILL SUCCEED ON THE MERITS OF ITS CLAIMS ........ 8

A. MCS Has Breached the Agreement ........ 9

1. MCS's Conduct Is a [redacted] ........ 9

2. The Proposed Sale Would Violate the Anti-Assignment Clause ........ 11

B. By Disclosing SS&C's Confidential Information, MCS Misappropriated SS&C's Trade Secrets Under New York and Federal Law ........ 12

1. SS&C's Software, Source Code, and Related Confidential Information Are Trade Secrets ........ 13

2. MCS Threatens to Misappropriate SS&C's Trade Secret Information ........ 18

C. SS&C Will Be Entitled to Its Requested Declaratory Relief ........ 19

1. SS&C Is Entitled to a Declaration that Disclosure of SS&C's Confidential Information During Diligence Would Violate the Agreement ........ 20

2. SS&C Is Entitled to a Declaration that the Proposed Sale Would Violate the Agreement Unless SS&C Consents in Writing ........ 20

3. SS&C Is Entitled to a Declaration that Its Declination of Consent Due to Competitive Concerns Is Not Per Se Unreasonable ........ 21

II. SS&C WILL SUFFER IRREPARABLE HARM THE MOMENT MCS FOLLOWS THROUGH ON ITS THREATENED DISCLOSURE ........ 22

A. The Agreement's Plain Terms Satisfy the Irreparable Harm Prong ................................ 22

B. SS&C Will Suffer Actual Irreparable Harm Upon Disclosure of Its Confidential Information ........................................................................................................ 23

III. THE BALANCE OF EQUITIES FAVORS AN INJUNCTION ............................................. 25

IV.THE PUBLIC INTEREST FAVORS AN INJUNCTION........................................................ 26

V. THE COURT SHOULD GRANT EXPEDITED DISCOVERY ............................................... 26

VI.NO BOND IS REQUIRED ....................................................................................................... 27

CONCLUSION ............................................................................................................................. 28

CERTIFICATE OF COMPLIANCE WITH THE WORD COUNT .............................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019)........................................................................ 28
*AIM Int'l Trading LLC v. Valcucine SpA.*,
188 F. Supp. 2d 384 (S.D.N.Y. 2002)........................................................................ 25
*Ayyash v. Bank Al-Madina*,
233 F.R.D. 325 (S.D.N.Y. 2005) ............................................................................... 27
*Benihana v. Benihana of Tokyo*,
784 F.3d 887 (2d Cir. 2015)........................................................................................ 8
*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017)........................................................................ 14
*Brooklyn Union Gas Co. v. Exxon Mobil Corp.*,
554 F. Supp. 3d 448 (E.D.N.Y. 2021) ................................................................... 19, 21
*Capstone Logistics Holdings, Inc. v. Navarrete*,
No. 17-cv-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018)............................ 22, 23
*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*,
598 F.3d 30 (2d Cir. 2010).......................................................................................... 8
*Cuesta Partners LLC v. Reingruber*,
No. 26-cv-3602 (DLC), 2026 WL 1971248 (S.D.N.Y. July 8, 2026) .............................. 22, 23
*Faiveley Transport Malmo AB v. Wabtec Corporation*,
559 F.3d 110 (2d Cir. 2009)........................................................................................ 23
*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984).......................................................................................... 23
*Greenfield v. Philles Records, Inc.*,
98 N.Y.2d 562 (2002) .................................................................................................. 9
*Harsco Corp. v. Segui*,
91 F.3d 337 (2d Cir. 1996)............................................................................................ 9
*Iacovacci v. Brevet Holdings, LLC*,
437 F. Supp. 3d 367 (S.D.N.Y. 2020)........................................................................ 12
*Iannucci v. Segal Co., Inc.*,
No. 06-cv-4720 (PKL), 2006 WL 8407380 & n.4 (S.D.N.Y. June 27, 2006)......................... 28
*IME Watchdog, Inc. v. Gelardi*,
2022 WL 1525486 (E.D.N.Y. May 13, 2022) .............................................................. 26
*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*,
920 F.2d 171 (2d Cir. 1990)..................................................................................... 13, 17
*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
443 F. Supp. 3d 303 (E.D.N.Y. 2020) ........................................................................ 26
*Int'l Bus. Machines Corp. v. De Freitas Limai*,
No. 20-cv-04573 (PMH), 2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020)................................ 28
*Invesco Inst. (N.A.), Inc. v. Deutsche Inv. Mgmt Am.*,
74 A.D.3d 696 (1st Dep't 2010) ................................................................................. 24

*Lazar v. Int'l Shoppes, LLC*,
2025 WL 1475627 (E.D.N.Y. May 22, 2025) ............................................................... 19
*Locus Techs. v. Honeywell Int'l Inc.*,
632 F. Supp. 3d 341 (S.D.N.Y. 2022)............................................................................ 18
*Marsh USA Inc. v. Karasaki*,
No. 08-cv-4195 (JGK), 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008).................................. 28
*Mercer Health & Benefits LLC v. DiGregorio*,
307 F. Supp. 3d 326 (S.D.N.Y. 2018)............................................................................ 25
*Mtivity, Inc. v. Office Depot, Inc.*,
525 F. Supp. 3d 433 (E.D.N.Y. 2021) ........................................................... 13, 17, 18
*N. Atl. Instruments, Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999)........................................................................................ 22
*Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*,
282 F. App'x 885 (2d Cir. 2008) ................................................................................ 24
*Nielsen Consumer LLC v. NPD Grp., Inc.*,
No. 22-cv-3235 (JPO), 2023 WL 5534694 (S.D.N.Y. Aug. 28, 2023) ..................................... 8
*Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020).............................................................................. 28
*Rokt Corp. v. AdsPostX, Inc.*,
No. 23-cv-2081 (LTS), 2025 WL 2711190 (S.D.N.Y. Sept. 23, 2025)................................... 27
*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*,
No. 10-cv-8976 (RJH), 2011 WL 497978 (S.D.N.Y. Feb. 10, 2011)...................................... 27
*SolarPark Korea Co. v. Solario Corp.*,
2023 WL 498159 (N.D. Cal. Aug. 2, 2023) .................................................................... 8
*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*,
No. 07-cv-2014 (SWK), 2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007)................................... 27
*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*,
68 F.4th 792 (2d Cir. 2023) .................................................................................. passim
*Thales Avionics, Inc. v. L3 Techs., Inc.*,
719 F. Supp. 3d 337 (S.D.N.Y. 2024)............................................................................ 25
*Ticor Title Ins. Co. v. Cohen*,
173 F.3d 63 (2d Cir. 1999)........................................................................................ 22
*Toretto v. Donnelley Fin. Sols., Inc.*,
583 F. Supp. 3d 570 (S.D.N.Y. 2022)............................................................................ 19
*Turret Labs USA, Inc. v. CargoSprint, LLC*,
No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022)....................................................... 14
*Two Wheel Corp. v. Am. Honda Corp.*,
506 F. Supp. 806 (E.D.N.Y. 1980) .............................................................................. 26
*Wheel Pros, LLC v. ASR Motorsport, LLC*,
2026 WL 102696 (E.D.N.Y. Jan. 14, 2026) .................................................................. 23
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..................................................................................................... 25

**Statutes**

18 U.S.C. § 1836(b)(3)(A)(i) ...................................................................................... 18
18 U.S.C. § 1839........................................................................................................ 12, 13

**Rules**

F.R.C.P. 65(a) .................................................................................................................... 1
L.R. 7 ............................................................................................................................ 30

SS&C Technologies, Inc.; SS&C Technologies Holdings, Inc.; and DST Health Solutions, LLC ("SS&C") submit this Memorandum of Law in support of their Motion for a Preliminary Injunction against MCS Healthcare Holdings, LLC and Medical Card System, Inc. ("MCS").

## INTRODUCTION

This motion seeks to preserve the status quo by stopping MCS's disclosure of SS&C's trade secrets and other confidential information in connection with an acquisition by non-party MedImpact Healthcare Systems, Inc. (with its affiliates, "MedImpact"), a direct competitor of SS&C across multiple segments of the healthcare industry. (the "Proposed Sale"). MCS possesses the source code and other confidential aspects of SS&C's PowerMHS product pursuant to a Perpetual Source Code Licensing Agreement (Declaration of Tori Dargati ("Dargati Decl."), Ex. A (the "Agreement")), and the Proposed Sale would give MedImpact possession of that confidential information—including impermissible insight into the PowerMHS platform's architecture and internal logic. The parties foresaw this risk when negotiating the Agreement, and they included confidentiality protections and an anti-assignment clause requiring SS&C's consent for any change-of-control transaction, subject only to a requirement that SS&C not unreasonably withhold its consent.

SS&C has reasonable concerns regarding a transaction that would let MedImpact possess its software, source code, and related confidential information, and it has thus not consented to the Proposed Sale. MCS has nevertheless indicated that it is continuing to pursue the transaction and has taken the position that SS&C's concerns are *per se* unreasonable. While this dispute is pending, the Court should enjoin MCS from either (a) disclosing SS&C's Confidential Information (as defined in the Agreement) as part of any diligence process or (b) consummating

the Proposed Sale without SS&C's consent. This would preserve the status quo—and without it, SS&C will suffer irreparable harm flowing from a competitor's possession of its sensitive source code and other confidential information. Indeed, the Agreement provides that even a [redacted] of its confidentiality provisions [redacted]

## FACTUAL BACKGROUND

SS&C is a leading provider of cloud-based and AI-enabled software and services for over 23,000 financial services and healthcare industry clients across 33 countries. From a one-person shop founded in 1986, SS&C has grown to employ more than 29,000 people, all of whom work to deliver cutting-edge software and services that let clients accurately, efficiently, and safely run their businesses and provide health care and other services to millions of people.

### A. The PowerMHS Platform

This dispute concerns SS&C's PowerMHS software, which is a healthcare claims processing and administration software platform. (Dargati Decl. ¶ 4.) PowerMHS's core value rests on its proprietary and confidential internal architecture and logic, business rules, user interface, and database design, which enable users to efficiently process medical claims. (*Id.* ¶¶ 4-7.) SS&C has invested decades of industry expertise and millions of dollars of research and development into making PowerMHS a leading medical claims processing platform. (*Id.*) The platform also benefits from continuous feedback from SS&C's clients. (*Id.* ¶ 7.) Over the decades, SS&C has invested significant effort in refining customer input to enhance its software to meet the customers' needs—and that work is instantiated in all aspects of the platform's design, architecture, and internal logic. (*See id.* at ¶¶ 4, 7.)

Given this significant investment, SS&C maintains the confidentiality of PowerMHS's software, inner workings, architecture and design details, business logic, and source code. When licensing PowerMHS to clients, SS&C insists on strict confidentiality protections, clear delineation of SS&C's ownership of the platform and all derivatives thereof, prohibitions on third-party access and disclosure, audit rights, and anti-assignment protections. (*Id.* ¶ 8.) SS&C also restricts client access to the PowerMHS source code even beyond the licensing agreement restrictions. (*See Id.* ¶ 9.)

**B. The 2025 Agreement**

MCS is a longtime client of SS&C. (*Id.* ¶ 11.) In October 2024, SS&C informed MCS that it planned to transition PowerMHS customers to AMISYS Advance, a flagship, AI-enabled platform that SS&C developed using the same subject-matter experts who helped develop PowerMHS and based on decades of SS&C's industry insight and customer feedback. (*Id.* ¶¶ 7, 11.) But as an alternative, SS&C gave MCS the option of licensing the PowerMHS source code so that MCS could continue using the same ecosystem. (*Id.* ¶¶ 11-12.) MCS chose to license PowerMHS, and the parties began negotiating an agreement. (*Id.*)

In June 2025, the parties exchanged redlines of a draft proposed licensing agreement for PowerMHS. (*Id.* ¶¶ 12-17.) SS&C's draft included its standard set of protections, but MCS proposed reducing certain of those protections by [redacted] (*Id.* Ex. B at 9.) SS&C agreed to [redacted] but rejected MCS's other changes, explaining that the arrangement would provide [redacted] and, as a result, [redacted] *Id.* Ex. C at 9.)

The parties executed the Agreement on June 30, 2025. (Agreement at 11.) In exchange for a "Source Code Licensing Fee" of [redacted] MCS received a [redacted] PowerMHS, subject to several key restrictions, including, among others: [redacted] (*Id.* §§ 2.2(c), 2.3, 2.4, 6.1.3, 6.3, 6.5.)

The final version of the anti-assignment provision states, in full:

[redacted]

[redacted]

(*Id.* § 6.5 (emphasis added).)

The Agreement defines "Confidential Information" broadly as [redacted] (*Id.* § 1.4.) The Agreement limits MCS's ability to share Confidential Information without SS&C's [redacted] permitting disclosure only to those [redacted] in the Agreement, or to fulfill legal obligations. (*Id.* § 6.3.1.) The parties also agreed that [redacted] of the Agreement's confidentiality provisions [redacted] (*Id.* § 6.7.15.)

**C. MCS Seeks Consent to Its Acquisition by MedImpact**

On August 5, 2026, MCS first informed SS&C of its potential acquisition by MedImpact and sought SS&C's consent to an assignment of the parties' licensing agreement for the PowerMHS software and source code to MedImpact. (Dargati Decl. ¶ 19.) Bloomberg reported

on the Proposed Sale that same day.[1] The Proposed Sale and requested assignment raised alarms for SS&C because MedImpact competes with SS&C across multiple segments of the healthcare industry. (Dargati Decl. ¶ 20.) In addition to competing in the medical claims sector, SS&C and MedImpact competed directly for MCS's own pharmacy benefits business—and MedImpact beat out SS&C to secure a contract with MCS to provide those services. (*Id.* ¶ 21.)

On September 2, 2026, Tori Dargati, General Manager of SS&C subsidiary DST Health Solutions, LLC, met via Microsoft Teams with James O'Drobinak, MCS's Chief Executive Officer. (*Id.* ¶ 22.) After conveying SS&C's competitive concerns to Mr. O'Drobinak, Ms. Dargati expressed SS&C's desire for a commercial resolution. (*Id.*) Mr. O'Drobinak acknowledged SS&C's proposal but ended the call without providing an alternative or counterproposal. (*Id.*)

On September 8, 2026, SS&C's General Counsel notified MCS that the Proposed Sale constitutes a material breach of the Agreement. (Declaration of Christman Rice ("Rice Decl."), Ex. A.) But SS&C expressed that it "remains hopeful that [the parties] can resolve this matter amicably without resorting to litigation and welcome another opportunity to discuss a mutually acceptable path forward," which SS&C suggested would be "most effective without lawyers being involved." (*Id.*) Two days later, Ms. Dargati reached out to Mr. O'Drobinak again to seek a commercial resolution but has not received any response. (Dargati Decl., Ex. F.)

Instead, MCS responded to SS&C via outside litigation counsel in a letter dated Saturday, September 12, 2026. (Rice Decl., Ex. B.) In that letter, MCS demanded SS&C's consent to the assignment within a week, took the position that SS&C was acting unreasonably, and stated that

---

[1] Ellen DiMauro & Paula Seligson, *Ares Eyes $2 Billion Loan Deal in Private Credit's Slow Year*, Bloomberg (Aug. 5, 2026, 3:14 PM EDT), https://www.bloomberg.com/news/articles/2026-08-05/ares-eyes-2-billion-loan-deal-in-slow-year-for-private-credit.

it would sue SS&C and seek damages. (*Id.*) On September 16, 2026, counsel for SS&C responded, explaining that MedImpact competes with SS&C and that SS&C's concerns were reasonable. (Rice Decl., Ex. C.) SS&C also invoked its audit rights and requested certain information. (*Id.*) On September 22, 2026, MCS's counsel provided some, but not all, of the requested information. (Rice Decl., Ex. D.) MCS stated that "no definitive agreement for the Proposed Sale has been signed for reasons unrelated to the present dispute," but it failed to provide any other information about the transaction's status. (*Id.*)

### D. The Proposed Sale Threatens to Expose SS&C's Confidential Information

If consummated, the Proposed Sale would give MedImpact possession of SS&C's software, source code, and other confidential information concerning the inner workings of PowerMHS and SS&C's related business—including the terms of the Agreement itself, which the parties agreed to keep confidential. Among other things, the Proposed Sale would enable employees of MedImpact to view and learn from SS&C's closely guarded trade secrets, gaining impermissible insights into the architecture, logic, business rules, and even user interface that have made PowerMHS such a successful tool in the medical claims processing space. (Dargati Decl., ¶ 25.) Indeed, the Agreement broadly defines "Confidential Information" precisely because of the risk that a competitor could profit from SS&C's trade secrets, even without accessing the code itself. (*Id.* ¶ 28.) Armed with such information, MedImpact could reverse engineer SS&C's offerings, undercut SS&C's pricing, and win away customers with products built on SS&C's own confidential architecture, logic, user interface, and workflows. (*Id.* ¶¶ 26-27.)

SS&C would face irreparable harm if MedImpact gains access to its confidential information. (*Id.* ¶¶ 28, 30.) Such harm would be impossible to unwind. (*Id.* ¶ 30.)

**ARGUMENT**

To obtain a preliminary injunction, a movant must demonstrate (1) "a likelihood of success on the merits"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) "that the balance of hardships tips in the plaintiff's favor"; and (4) "that the public interest would not be disserved by the issuance of an injunction." *Benihana v. Benihana of Tokyo*, 784 F.3d 887, 895 (2d Cir. 2015). Courts routinely enjoin parties from conduct that—like MCS's—threatens to disclose a movant's trade secrets or other confidential information. *See, e.g.*, *Nielsen Consumer LLC v. NPD Grp., Inc.*, No. 22-cv-3235 (JPO), 2023 WL 5534694, at *4, *6-7 (S.D.N.Y. Aug. 28, 2023) (finding the prospect of disclosure of confidential information from merger constituted irreparable harm); *SolarPark Korea Co. v. Solario Corp.*, 2023 WL 498159, at *8-10 (N.D. Cal. Aug. 2, 2023) (issuing injunction preventing licensee from using or disclosing licensor's confidential information in connection with licensee's merger with a company that did business with a competitor of licensor). SS&C is also entitled to a preliminary injunction if it shows "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## I. SS&C WILL SUCCEED ON THE MERITS OF ITS CLAIMS

The Complaint pleads three species of claims: breach of the Agreement (Count I), misappropriation of trade secrets under New York and federal law (Counts II and III), and claims for declaratory relief clarifying the parties' rights and obligations (Counts IV, V, and VI). SS&C is likely to succeed on each claim.

### A. MCS Has Breached the Agreement

A claim for breach of contract under New York law[2] requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Because the Agreement "is complete, clear and unambiguous on its face," it "must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

MCS's pursuit of the Proposed Sale breaches the Agreement in at least two separate ways: it is a [redacted] of the Agreement's confidentiality provisions, constituting a breach warranting injunctive relief, (Agreement § 6.7.15), and the Proposed Sale, if consummated, would violate the Agreement's anti-assignment provision.

#### 1. MCS's Conduct Is a [redacted]

SS&C negotiated sweeping confidentiality protections in exchange for providing MCS with access to the software, specifications, and source code behind PowerMHS. "Confidential Information" includes [redacted]." (Agreement § 1.4.) MCS agreed that it [redacted] (*Id.* § 6.3.1.) It further agreed that it may not, [redacted]

[2] The Agreement has a choice-of-law provision requiring the application of New York law. (Agreement § 6.7.9.)

[redacted] (*Id.* §§ 2.3(b), 2.3(d), 2.3(f).) MCS is permitted to disclose Confidential Information only to [redacted] (*Id.* § 6.3.1(a).)

Facilitating a sale is not a basis for disclosure—even assuming that the acquiror is bound by its own nondisclosure obligations. Indeed, MCS has conceded that the Agreement prohibits this. (*See, e.g.*, Rice Decl., Ex. D, at 2.) Yet MCS has apparently disclosed at least some Confidential Information to third parties: as multiple media outlets have reported, on the same day as MCS's initial outreach to SS&C regarding the Proposed Sale, MedImpact was closing in on obtaining over $2B in financing to support its acquisition of MCS.[3]

The parties agreed that [redacted]" (Agreement § 6.7.15.) These circumstances have come to pass. MCS either has disclosed or will soon disclose the terms of the Agreement and other Confidential Information to intermediaries of MedImpact—which would be standard under normal due diligence—constituting a [redacted] that SS&C is entitled to enjoin.

---

[3] *See, e.g.*, Ellen DiMauro and Paula Seligson, "Ares Eyes $2 Billion Loan Deal in Private Credit's Slow Year," *Bloomberg* (Aug. 5, 2026), https://www.bloomberg.com/news/articles/2026-08-05/ares-eyes-2-billion-loan-deal-in-slow-year-for-private-credit; Sami Vukelj, "MedImpact in talks for $2.2B private credit loan to support acquisition," *PitchBook* (Aug. 7, 2026), https://pitchbook.com/news/articles/medimpact-in-talks-for-2-2b-private-credit-loan-to-support-acquisition.

**2. The Proposed Sale Would Violate the Anti-Assignment Clause**

MCS would independently breach the Agreement by consummating the Proposed Sale. Section 6.5 of the Agreement provides, in relevant part:

[redacted]

MCS has acknowledged that "the Agreement requires MCS to obtain SS&C's 'prior written consent' to an assignment or transfer of MCS's rights under the Agreement, and to a change of control of MCS," (Rice Decl., Ex. B, at 2), and that, "[b]ecause the Proposed Sale would constitute a change of control, MCS requested SS&C's prior written consent" (*id.* at 5). SS&C has not given that consent. (*See* Rice Decl., Ex. C, at 1 ("For the avoidance of doubt, SS&C has not consented and does not now consent.").)

MCS's counsel nevertheless has suggested that MCS is permitted to pursue the Proposed Sale because it "would effect a change of control of MCS, but it would not transfer or assign MCS's rights under the Agreement." (Rice Decl., Ex. B, at 4.) The Agreement forecloses that argument: a change of control [redacted] Agreement § 6.5(a).) Even though entering into the Proposed Sale without consent

[redacted] (*id.* § 6.5), MCS has stated, "under no circumstances would SS&C Health be entitled to enjoin the signing of a definitive agreement for, or consummation of, the Proposed Sale." (Rice Decl., Ex. D, at 2.)

MCS is wrong, and its continued conduct constitutes a breach.

### B. By Disclosing SS&C's Confidential Information, MCS Misappropriated SS&C's Trade Secrets Under New York and Federal Law

SS&C's trade secret misappropriation claim under federal and New York law requires SS&C to establish "that it possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) ("The elements for a misappropriation claim under New York law are fundamentally the same.").

The DTSA defines trade secrets to mean "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," where the owner "has taken reasonable measures to keep such information secret," and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). To determine whether a trade secret exists, New York courts examine:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990); *accord Mtivity, Inc. v. Office Depot, Inc.*, 525 F. Supp. 3d 433, 446 (E.D.N.Y. 2021) (noting that federal courts consider these factors, too). "Misappropriation" is defined broadly to include, among other things, the acquisition of a trade secret "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret," or through "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. §§ 1839(5)(B)(II), (6)(A). Misappropriation includes disclosure of a trade secret in violation of contractual confidentiality provisions. *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp.*, 68 F.4th 792, 806 (2d Cir. 2023) (holding that where contract's terms "did not authorize Syntel to use TriZetto's trade secrets to compete with TriZetto," unauthorized use of the trade secrets constituted misappropriation "in violation of the DTSA and New York law").

### 1. SS&C's Software, Source Code, and Related Confidential Information Are Trade Secrets

The "proprietary internal architecture and logic, business rules, . . . and database design" underlying PowerMHS, and the technical documentation "detailing or describing the platform's internal architecture, business logic, and other key aspects" are each trade secrets under the DTSA and New York law. (Dargati Decl. ¶¶ 6, 9-10.)

#### a. The Information Is Not Generally Known Within or Without SS&C's Business

Software architecture is a protectable trade secret. *Integrated Cash Mgmt.*, 920 F.2d at 174 (affirming injunction barring former ICM personnel and company they joined from using software architecture). The Second Circuit has specifically applied this principle to medical claims processing software. *See Syntel*, 68 F.4th at 796, 801-02 & n.10 (affirming verdict that modules at "the heart of" Facets, a platform handling "claim processing, claim adjudication, and billing," were trade secrets where they "convey[ed] the architecture of the Facets software" and

owner "ke[pt] confidential" that architecture); *see also Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 498, 516-17 (S.D.N.Y. 2017) (Stein, J.) (recognizing that software architecture "can be a trade secret" and that "no matter how generic or obvious the individual widget components" of software were, developer "arranged them all into a unique and synergistic system architecture").

The "architecture and functionality" of PowerMHS "reflect decades of SS&C industry expertise and are tightly guarded trade secrets." (Dargati Decl. ¶ 6.) Even within SS&C, that information is closely held. SS&C hosts the source code in an environment "which is not connected to the internet," and "[a]ccess is restricted to user IDs and passwords provisioned by SS&C's security team via iSeries security to SS&C employees." (*Id.* ¶ 9.) Documentation describing the platform's "internal architecture, business logic, and other key aspects" is available only to "a limited subset of SS&C personnel." (*Id.* ¶ 10.) Outside SS&C, "[n]o clients have credentials to access" the source-code environment, (*id.* ¶ 9), and MCS holds its copy of the source code only under the Agreement that designates [redacted] as Confidential Information. (Agreement § 1.4.) The way PowerMHS's components work together to process high volumes of claims is known only to SS&C and to those it has contractually bound to secrecy.

**b. SS&C Takes Reasonable Measures to Maintain the Secrecy of the Information**

For licensed software, "the reasonableness analysis will often focus on who is given access, and on the importance of confidentiality and nondisclosure agreements to maintaining secrecy." *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *2-3 (2d Cir. Mar. 9, 2022) (summary order) (affirming dismissal of DTSA claim where developer's licensee could grant users access without any "confidentiality or nondisclosure agreements"); *see*

*also Syntel*, 68 F.4th at 797, 804 (owner of healthcare claims platform gave counterparty "access to its trade secrets" subject to provisions "preventing the use of any TriZetto trade secret without TriZetto's permission").

SS&C protects the Source Code on a system "not connected to the internet," limits access to credentials its security team gives to SS&C employees, and ensures that "[a]ll source code and executables are encrypted at rest," with "additional physical and electronic security measures" at the datacenter. (Dargati Decl. ¶ 9.) The technical documentation sits on "secure SS&C servers and devices," accessible only through "SS&C-issued, password-protected devices and/or credentials." (*Id.* ¶ 10.) When SS&C licenses PowerMHS, it imposes "strict confidentiality obligations," retains "ownership of the platform and all derivatives of the software," prohibits "third-party access and disclosure," and reserves "audit rights" and "the ability to object to assignment to a third party." (*Id.* ¶ 8.)

MCS received a [redacted] (Agreement § 2.2(a).) It agreed not to [redacted] (*Id.* § 2.3(f).) It must [redacted] SS&C's Confidential Information, and it may share that information only with persons who need it to perform under the Agreement and [redacted] (*Id.* § 6.3.1.) Those obligations [redacted] (*Id.* § 6.4.2.) When SS&C and MCS negotiated the Agreement, SS&C insisted on a robust anti-assignment clause specifically because the Agreement gives MCS access to SS&C's source code. (Dargati Decl. Exs. C, E.)

These requirements are emblematic of SS&C's efforts to bind licensees to strict contractual confidentiality protections, in addition to digital and physical security controls.

**c. The Information Provides Competitive Value to SS&C**

The Second Circuit found in *Syntel* that medical claims processing software is a protectable trade secret where it derived value from not being generally known to competitors. *Syntel*, 68 F.4th at 796, 802-03 & n.13 (affirming verdict that code, data model, and technical manuals for platform that handles "claim processing, claim adjudication, and billing" were trade secrets where "the inner workings" of product were "very important").

PowerMHS's value "derives from its proprietary internal architecture and logic, business rules, . . . and database design," and SS&C "continues to rely on the technical innovations contained within the PowerMHS platform across many of its commercial products." (Dargati Decl. ¶ 6.) That SS&C is ending routine support for PowerMHS at the end of 2026, (*id.* ¶ 11), does not diminish its worth: PowerMHS "has—and will continue to have—commercial value to SS&C after 2026 and remains competitively sensitive." (*Id.* ¶ 7.) MCS confirmed that value when it agreed to pay approximately [redacted] to license the platform. (*Id.* ¶¶ 11-12.)

MedImpact's "Verdegard platform competes directly with PowerMHS," and MedImpact often bids against SS&C "in response to the same requests for proposal" in both the medical and pharmacy lines of business. (Dargati Decl. ¶¶ 20-21.) With exposure to SS&C's code and documentation—and to the MCS personnel who understand the technology best—MedImpact "could replicate or improve on SS&C's offerings, undercut SS&C's pricing, and target SS&C's customers with competing products built on SS&C's own proprietary innovations." (*Id.* ¶ 26.) That threat reaches "multiple lines of SS&C's business" because "many of SS&C's software products rely on a similar infrastructure as PowerMHS." (*Id.* ¶ 27.)

**d. SS&C Devoted Time and Resources to Create the Product**

Investment of time and resources demonstrates effort expended to create trade secret protectable information. *See, e.g.*, *Mtivity, Inc. v. Office Depot*, 525 F. Supp. 3d 433, 446 (E.D.N.Y. 2021) (software licensor adequately alleged trade secret where it "spent over $18 million and 18 years of labor on research and development"); *see also Integrated Cash Mgmt.*, 920 F.2d at 172, 174 (developer's "large investment in research and development" of software supported trade secret status); *Syntel*, 68 F.4th at 798 (trade secret owner spent "over $500 million" on research and development of medical claims processing software).

SS&C "has invested hundreds of millions of dollars in developing and refining PowerMHS and its other software platforms in the healthcare space." (Dargati Decl. ¶ 5.) PowerMHS's architecture and functionality "reflect decades of SS&C industry expertise" (*id.* ¶ 6), refined through "responses to client requests, customization requests, market feedback, and regulatory and industry developments." (*Id.* ¶ 7.) Its architecture "is based on and instantiates decades of SS&C's industry expertise and client feedback." (*Id.* ¶ 27.) The Proposed Sale risks allowing MedImpact to inherit the product of that investment.

**e. The Information Cannot Easily Be Acquired or Duplicated by Others**

Information that cannot "be readily duplicated without the secret information acquired by [its owner] through years of research" is protectable as a trade secret. *Integrated Cash Mgmt.*, 920 F.2d at 174 (software architecture not readily ascertainable "other than by the improper disclosure and use" of former programmers bound by nondisclosure agreements).

No other competitor can legally obtain information about PowerMHS's inner workings. SS&C employs robust security measures, safeguarding not just the source code but also all information and documentation about the Software, including its internal design, architecture,

and business logic. Such information "would permit MedImpact to understand SS&C's proprietary architecture, internal logic, and design—even if it never accessed the PowerMHS source code directly." (Dargati Decl. ¶ 28.) So would disclosures of know-how by MCS's team: "[t]hrough years of operating, modifying, and building on the PowerMHS platform, MCS personnel have developed detailed knowledge of PowerMHS's architecture, functionality, and design." (*Id.* ¶ 29.)

**2. MCS Threatens to Misappropriate SS&C's Trade Secret Information**

A party that receives access to trade secrets under a confidentiality obligation misappropriates them when it uses or discloses them in violation of those provisions. *See Syntel*, 68 F.4th at 804-06 (holding that agreement "did not authorize Syntel to use TriZetto's trade secrets to compete with TriZetto," and by using them to compete, "Syntel misappropriated TriZetto's intellectual property in violation of the DTSA and New York law"); *see also Mtivity*, 525 F. Supp. 3d at 446 (holding licensee liable for trade secret violations where it "gave Mtivity's competitor access to proprietary software"); *Locus Techs. v. Honeywell Int'l Inc.*, 632 F. Supp. 3d 341, 377-79 (S.D.N.Y. 2022) (finding trade secret misappropriation under Delaware law where licensee's RFP disclosed information obtained under license and in acquisition due diligence to licensor's "major competitors"). The DTSA authorizes an injunction "to prevent any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3)(A)(i).

MCS acquired SS&C's Confidential Information under the Agreement, which obligated it not to disclose [redacted] The Agreement permits disclosure only to those who need the information [redacted] and [redacted] (Agreement §§ 2.3(f), 6.3.1.) MCS is nonetheless pursuing an acquisition by MedImpact, "a

direct competitor of SS&C across multiple segments of the healthcare technology and benefits administration industry." (Dargati Decl. ¶¶ 19-20.) Any disclosure of the Agreement or SS&C's technical information to MedImpact, its advisors, or third parties constitutes misappropriation. Disclosure of information to MedImpact risks disclosure of SS&C's trade secret information to its direct competitor, and consummation of the Proposed Sale would constitute even clearer misappropriation.

The Agreement flatly prohibits such disclosure, as does common sense. *See Syntel*, 68 F.4th at 806 (finding it "fanciful to suggest that [licensor] would authorize [licensee] to use its trade secrets to compete for business without saying so" and refusing to assume that "sophisticated, multi-billion-dollar enterprises" "would alter fundamental aspects of their contractual relationship in vague terms"). The Agreement requires SS&C's prior written consent to any change of control of MCS, and it specifically denotes this requirement in circumstances of any "[redacted] (Agreement § 6.5.) Nothing in the Agreement permits MCS to put SS&C's trade secrets in a competitor's hands.

**C. SS&C Will Be Entitled to Its Requested Declaratory Relief**

SS&C will also be entitled to its requested declaratory relief reaffirming MCS's obligations under the Agreement. A declaratory judgment claim "must be forward looking and address the possibility that a plaintiff may face future harm from a defendant's act or omission." *Lazar v. Int'l Shoppes, LLC*, 2025 WL 1475627, at *5 (E.D.N.Y. May 22, 2025). Declaratory judgment claims regularly proceed where the plaintiff's underlying claims survive. *See, e.g.*, *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 606 (S.D.N.Y. 2022) (denying a motion to dismiss a declaratory judgment claim when "Plaintiffs have adequately pleaded a substantive claim against" a defendant); *Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 554 F. Supp. 3d 448, 469 (E.D.N.Y. 2021) (same).

Here, SS&C is entitled to three declarations (Counts IV, V, and VI) establishing that: (1) MCS will have materially breached the Agreement if it exposes any of SS&C's Confidential Information to any third party in connection with the Proposed Sale without SS&C's consent; (2) the Proposed Sale constitutes an assignment as defined by the Agreement, requiring SS&C's prior written consent; and (3) SS&C's declination of consent to the Proposed Sale is not unreasonable as a matter of law in light of SS&C's concerns that the Proposed Sale would give a competitor possession of SS&C's Confidential Information and trade secrets.

**1. SS&C Is Entitled to a Declaration that Disclosure of SS&C's Confidential Information During Diligence Would Violate the Agreement**

SS&C's first declaratory relief claim (Count IV) is likely to succeed because any disclosures relating to the Agreement—including any sharing of the Agreement itself—would violate the Agreement itself. As discussed above, the Agreement broadly defines Confidential Information to include the [redacted] (Agreement § 1.4.) The Agreement bars [redacted] (*Id.* §§ 2.3, 6.3.1.)

SS&C's requested declaration merely reaffirms MCS's basic contractual commitments on a go-forward basis.

**2. SS&C Is Entitled to a Declaration that the Proposed Sale Would Violate the Agreement Unless SS&C Consents in Writing**

SS&C's second declaratory relief claim (Count V) is likely to succeed because the Agreement's anti-assignment provision applies here. The Proposed Sale would result in the

acquisition of MCS by another entity, constituting a "change of control" as defined by the Agreement. (*Id.* § 6.5.) And [redacted] (*Id.*) MedImpact is a competitor of SS&C, and SS&C has not consented to the Proposed Sale. (Dargati Decl. ¶¶ 20-22.) Therefore, any attempted assignment without SS&C's prior written consent would be [redacted] (Agreement § 6.5.)

Again, SS&C's requested declaration simply reaffirms these requirements—and MCS's counsel has already acknowledged their applicability, notwithstanding MCS's efforts to proceed with the Proposed Sale.

### 3. SS&C Is Entitled to a Declaration that Its Declination of Consent Due to Competitive Concerns Is Not Per Se Unreasonable

SS&C's third declaratory relief claim (Count VI) is likely to succeed because MCS has no basis for its continued assertion that SS&C's competitive concerns are unreasonable as a matter of law. The Agreement states that SS&C's consent to an [redacted] (Agreement § 6.5), and SS&C has explained its concerns about the competitive threat that would flow from MedImpact's acquisition of the Confidential Information. (Dargati Decl. ¶¶ 20-21.) Indeed, the risks from MedImpact gaining access to SS&C's proprietary information are immense. (*See id.* ¶¶ 25-30.) But MCS has taken the position that those concerns are *per se* unreasonable. (Rice Decl., Ex. B, at 7-9.)

SS&C's requested declaration would simply clarify that its concerns are not unreasonable as a matter of law—a straightforward reading of the contract, which is necessary because any other reading would render SS&C's consent rights a practical nullity.

## II. SS&C WILL SUFFER IRREPARABLE HARM THE MOMENT MCS FOLLOWS THROUGH ON ITS THREATENED DISCLOSURE

MCS has agreed that SS&C would be irreparably harmed by even a [redacted] of the Agreement's confidentiality provisions, and the Court need not inquire further. (Agreement § 6.7.15.) But the facts and governing law separately confirm that SS&C will be harmed beyond repair if MedImpact is given access to its Confidential Information.

### A. The Agreement's Plain Terms Satisfy the Irreparable Harm Prong

MCS agreed that [redacted] of the confidentiality provisions of the Agreement [redacted] (Agreement § 6.7.15.) MCS's present conduct constitutes, at a minimum, a [redacted] of those restrictions that would cause irreparable injury. As this Court recently explained, "the Circuit has found support for irreparable harm in breach-of-contract cases where defendants have acknowledged, in their contracts, that a breach of the confidentiality clause would cause irreparable injury to [plaintiffs]." *Cuesta Partners LLC v. Reingruber*, No. 26-cv-3602 (DLC), 2026 WL 1971248, at *7 (S.D.N.Y. July 8, 2026) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (cleaned up)); *see also Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68-69 (2d Cir. 1999) (noting that defendant's acknowledgment in the contract that plaintiff "shall be entitled to injunctive relief . . . might arguably be viewed as an admission by [the defendant]"); *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-cv-4819 (GBD), 2018 WL 6786338, at *34 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020) (finding irreparable harm where parties' written agreement stated that a violation of their restrictive covenants would result in irreparable harm).

Most recently in *Cuesta*, Judge Cote found dispositive that a former employee and employer signed an agreement in which the employee "acknowledges and agrees that . . . irreparable injury will be suffered by [employer] should [employee] breach any of those provisions" because such a breach "cannot be adequately compensated by monetary damages." 2026 WL 1971248, at *7. Given that irreparable injury provision, Judge Cote determined that the employee's "argument now that no irreparable harm has occurred fails" and subsequently enjoined the employee from possessing, using, or disseminating confidential information regarding the employer. *Id.*

The same logic applies here.

**B. SS&C Will Suffer Actual Irreparable Harm Upon Disclosure of Its Confidential Information**

Even without MCS's written admission, the actual or threatened disclosure of SS&C's Confidential Information to its competitor MedImpact is a quintessential irreparable harm. It cannot be measured in money damages because a trade secret, once lost to a competitor, is lost forever. This principle is well established across decades of Second Circuit jurisprudence. *See, e.g.*, *Cuesta*, 2026 WL 1971248, at *7 ("The Second Circuit has found irreparable harm when information 'of great value' is disclosed, such as trade secrets or other information covered under a confidentiality agreement, because that loss 'cannot be measured in money damages.'") (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co*., 730 F.2d 61, 63 (2d Cir. 1984)); *Wheel Pros, LLC v. ASR Motorsport, LLC*, 2026 WL 102696, at *15 (E.D.N.Y. Jan. 14, 2026) (finding "a presumption of irreparable harm" where plaintiff showed "there is an actual and imminent risk that Defendants will disseminate [plaintiff's] trade secrets to a wider audience beyond [Defendants' company]") (applying *Faiveley Transport Malmo AB v. Wabtec Corporation*, 559 F.3d 110, 118 (2d Cir. 2009)); *Capstone Logistics*, 2018 WL 6786338, at *34 (granting

preliminary injunction and finding irreparable injury "where there is danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets") (quoting *Invesco Inst. (N.A.), Inc. v. Deutsche Inv. Mgmt Am*., 74 A.D.3d 696, 697 (1st Dep't 2010)); *Nielsen* at *4, *6-7 (finding that the mere prospect of disclosure of confidential information resulting from a merger with a competitor constituted irreparable harm and enjoining such disclosure—but declining to enjoin the merger entirely where agreement lacked anti-assignment provision or consent rights); *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008) (recognizing that irreparable harm existed where the non-movant gained access to trade secrets by signing a confidentiality agreement and then took actions to exploit the movant's confidential information).

Here, the risk of irreparable loss is immediate and extraordinary. Indeed, MCS has almost certainly disclosed SS&C's Confidential Information to competitor MedImpact during due diligence relating to the Proposed Sale, risking severe, irreversible harm. (*See* Dargati Decl. ¶¶ 25-30.) Public reporting has confirmed that the Proposed Sale has progressed to the point that MedImpact is obtaining a $2.2 billion second-lien credit facility to finance the sale,[4] suggesting that substantial diligence has already been completed.

In either scenario—whether SS&C's proprietary source code is on the cusp of misappropriation or already well into it—irreparable harm inures. SS&C and MedImpact operate in the same industry, provide overlapping products and services, pitch to the same prospective clients, and compete for the same dollars. (Dargati Decl. ¶¶ 20-21.) Allowing

[4] Sami Vukelj, *MedImpact In Talks for $2.2B Private Credit Loan to Support Acquisition*, PitchBook (Aug. 7. 2026), https://pitchbook.com/news/articles/medimpact-in-talks-for-2-2b-private-credit-loan-to-support-acquisition.

MedImpact to look under the hood of SS&C's valuable PowerMHS product—even indirectly—would eviscerate SS&C's ability to compete. (*Id.* ¶¶ 25-30.) This is precisely the type of irreparable harm that prohibitory preliminary injunctions are meant to prevent.

## III. THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

The balance of the equities strongly favors an injunction here. When balancing the equities, the Court weighs "the competing claims of injury" and "consider[s] the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As argued above, the balance of the equities favors SS&C, which would suffer serious hardship without an injunction—especially because the injunction would do nothing more than preserve the status quo and ensure that MCS complies with its agreed-upon contractual duties.

Courts in the Southern District routinely grant preliminary injunctive relief to preserve the status quo in breach-of-contract cases. *See, e.g.*, *AIM Int'l Trading LLC v. Valcucine SpA.*, 188 F. Supp. 2d 384, 388 (S.D.N.Y. 2002) (granting a TRO to protect plaintiffs' business from being terminated during the litigation without cause in violation of the parties' agreement on the basis that "the balance of equities tips firmly in plaintiffs' favor if the status quo is not preserved, their business will be wiped out") (Leisure, J.); *Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 349 (S.D.N.Y. 2024) (Koeltl, J.) (granting a preliminary injunction to prevent a sale of defendant's stake in the parties' joint venture to "preserve the status quo" because otherwise, the plaintiff would lose its contractual right to match any offer for defendant's interest); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 354-55 (S.D.N.Y. 2018) (Koeltl, J.) (enjoining individual defendants from violating their non-solicitation and confidentiality agreements with the plaintiff and finding that "the balance of the equities tips decidedly in favor of [the plaintiff]" where the plaintiff "merely seeks to maintain the status

quo”). Conversely, MCS will suffer no cognizable hardship from continuing with business as usual. *See Two Wheel Corp. v. Am. Honda Corp.*, 506 F. Supp. 806, 822 (E.D.N.Y. 1980) (granting preliminary injunction to restore the license of a car dealership that had operated under the license for almost 15 years where “the balance of hardships in this matter tips decidedly toward the plaintiff who, in the absence of preliminary relief, would lose its business, its location, its reputation and its goodwill”).

## IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION

SS&C’s narrow proposed relief serves the public interest, which depends on the enforcement of contract rights and the protection of trade secrets. Indeed, the public interest is advanced where “an injunction would tend to encourage parties to abide by their agreements.” *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 338 (E.D.N.Y. 2020). Similarly, a preliminary injunction protecting SS&C’s trade secrets services the public interest in “protecting plaintiff’s legitimate interests in maintaining the value of its business relationships” and “the secrecy of its trade secrets and confidential information.” *Id.* at 347; *IME Watchdog, Inc. v. Gelardi*, 2022 WL 1525486, at *8 (E.D.N.Y. May 13, 2022) (“It goes without saying that ensuring fair play in the commercial arena and protecting consumers from dishonest competitive practices serve the public interest.”). Barring MCS from further violating the Agreement by disclosing SS&C’s Confidential Information and preventing competitors from accessing SS&C’s trade secrets therefore serves the public interest in safeguarding contract rights and protecting trade secrets.

## V. THE COURT SHOULD GRANT EXPEDITED DISCOVERY

SS&C has already made a sufficient showing to support a preliminary injunction, but targeted discovery on an expedited basis would further develop the factual background surrounding the Proposed Sale and confirm whether and the extent to which MCS has

improperly disclosed SS&C's Confidential Information as part of the financing and diligence process. (*See supra* § II(A)(1) & notes 1 & 3.) When considering requests for expedited discovery, courts employ a "flexible standard of reasonableness and good cause." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005). SS&C has demonstrated good cause that its targeted requests are reasonably tailored to identify important information, including: (1) the status of the Proposed Sale; (2) any information relating to SS&C that has been disclosed to MedImpact; (3) any on-site visits to MCS facilities and any individuals who participated; and (4) any documents or communications referencing SS&C or its Confidential Information. (*See* Rice Decl., Exs. F-G.)

Courts routinely grant requests for similar expedited discovery in support of a preliminary injunction to uncover details about possible misappropriation of trade secrets and to reveal relevant information about a pending consolidation. *See, e.g.*, *Rokt Corp. v. AdsPostX, Inc.*, No. 23-cv-2081 (LTS), 2025 WL 2711190, at *5, 15, 17-19 (S.D.N.Y. Sept. 23, 2025) (granting a preliminary injunction after expedited discovery revealed that misappropriated trade secrets helped to build a competing software platform); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 07-cv-2014 (SWK), 2007 WL 1121734, at *1, 4 (S.D.N.Y. Apr. 11, 2007) (affirming the grant of expedited discovery in aid of a preliminary injunction motion in connection with the consolidation of two regulatory entities). This Court should do the same.

## VI. NO BOND IS REQUIRED

The Court should waive the bond requirement because MCS has already agreed that SS&C is entitled to the requested relief [redacted] (Agreement § 6.7.15.) Courts in the Southern District regularly waive the bond requirement in these circumstances. *See, e.g.*, *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, No. 10-cv-8976 (RJH), 2011 WL 497978 (S.D.N.Y. Feb. 10, 2011), *aff'd,* 468 F. App'x 43 (2d Cir.

2012) (waiving the bond requirement where the governing agreement states that injunctive relief may be available "without necessity of posting a bond"); *Int'l Bus. Machines Corp. v. De Freitas Limai*, No. 20-cv-04573 (PMH), 2020 WL 5261336, at *15 (S.D.N.Y. Sept. 3, 2020), *aff'd sub nom. Int'l Bus. Machines Corp. v. Lima*, 833 F. App'x 911 (2d Cir. 2021) (same); *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239, at *21 (S.D.N.Y. Oct. 31, 2008) (same); *Iannucci v. Segal Co., Inc.*, No. 06-cv-4720 (PKL), 2006 WL 8407380, at *6 & n.4 (S.D.N.Y. June 27, 2006) (same). Nor could Defendants show that they would suffer any cognizable harm from a preliminary injunction that merely maintains the status quo. *See Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs*., 510 F. Supp. 3d 29, 51 (S.D.N.Y. 2020) ("No bond is needed because Defendants have not shown a likelihood of financial harm."); *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019) ("Because Defendants do not identify any 'costs or damages' they may incur if wrongfully enjoined, this Court waives the Rule 65(c) bond requirement in its discretion.").

## CONCLUSION

For the foregoing reasons, SS&C respectfully requests that the Court enter the attached Proposed Order, which would (a) preliminarily enjoin MCS, during the pendency of this action, from (i) disclosing any of SS&C's Confidential Information to MedImpact or any other third party in connection with pre-acquisition diligence or other disclosures, or (ii) consummating an acquisition of MCS by MedImpact without SS&C's prior written consent as required by Section 6.5 of the Agreement, and also (b) require MCS to submit to targeted discovery on an expedited basis.

Dated: September 25, 2026

**BRAUNHAGEY & BORDEN LLP**

By: */s/ Christman Rice*

Christman Rice
Marissa R. Benavides
Seth Massey
Samuel Libby
**BRAUNHAGEY & BORDEN LLP**
200 Madison Avenue, 23rd Floor
New York, NY 10016
Telephone: (646) 829-9403
Facsimile: (646) 403-4089
rice@braunhagey.com

*Counsel for Plaintiffs SS&C Technologies, Inc., et al.*

**CERTIFICATE OF COMPLIANCE WITH THE WORD COUNT**

The undersigned, counsel of record for Plaintiffs SS&C Technologies, Inc.; SS&C Technologies Holdings, Inc.; and DST Health Solutions, LLC (collectively, "SS&C" or "Plaintiffs"), certifies that this brief, inclusive of point headings and footnotes and exclusive of the caption, table of contents, table of authorities, and signature block, contains 8522 words, which complies with the Local Rule's limit of 8,750 words. *See* L.R. 7.1(c).

This certification was prepared in reliance on the word-count function of Microsoft Word, the word-processing system used to prepare the document.

Dated: September 25, 2026

By: */s/ Christman Rice*
Christman Rice